OPINION OF THE COURT
Thomas P. Phelan, J.
Plaintiffs’ application for injunctive relief is denied. For the *315 reasons hereinafter stated, the court finds that plaintiffs have failed to establish the elements of the tripartite test for preliminary injunctive relief.
Plaintiff Roman Catholic Diocese of Rockville Centre is the current owner of a 100-acre parcel of land located on Jericho Turnpike in the Incorporated Village of Old Westbury (the property).
By this application plaintiffs (the Diocese) seek three directions from this court to the defendants (the Village): that the Village permit the Diocese to establish a cemetery on the property, that the Village establish a meaningful, legitimate process to act upon a pending zoning application in an expedited manner and with due consideration for its religious nature, and that the Diocese’s application for cemetery use be referred to the Nassau County Legislature pursuant to section 451 of the Real Property Law.
The Diocese wrote to the Village in January 1993 advising that the Diocese was the contract vendee of property located on Jericho Turnpike upon which the Diocese intended to establish a cemetery. By letter dated February 10, 1993 the Village responded, in part, that use of property for cemetery purposes is not a permitted use within the Village and if the Diocese intended to seek a change of zone, an application must be presented to the Board of Trustees.[1] The Diocese filed a change-of-zone application as contract vendee in October 1993. Much later, after the Diocese became the owner of the property, the Village, by resolution, dated March 18, 1996, denied the Diocese’s application.
The reasons for the passage of time between submission of the application and the resolution are adequately set forth in the papers. No improper conduct can be imputed to the Village for the expanse of time between the two events.
In the resolution, defendants noted that a cemetery is not a permitted use in the Village, that the Diocese had applied to change the zone to permit such a use, that the Village was required to use its zoning powers in accordance with its comprehensive plan, that the initial question is whether the Diocese’s application is in accordance with the existing comprehensive plan, that the matter was considered by the village planner, who rendered his report, that a public hearing was held, and that at the hearing plaintiffs’ presentation did *316 not include a request for a change of the Village’s comprehensive plan.[2]
Therefore, Old Westbury Village Board concluded that the use of property in the Village for a cemetery is not in accordance with the comprehensive plan of the Village, that the Diocese has not demonstrated that the comprehensive plan should be changed to include a cemetery use because of the Village’s change and growth, and that the proposed amendment is calculated to benefit an individual landowner, rather than a community as a whole.
In opposition to the position taken by the Village, the Diocese asserts as the basis for its present request for injunctive relief that it is faced with an emergency. It claims it is running out of burial space at its Cemetery of the Holy Rood. It also asserts that the Village needlessly delayed the Diocese’s application and failed to take into consideration the religious nature of its application.
A party seeking injunctive relief must establish that irreparable harm will befall it absent the granting of such relief, that there is a likelihood of success on the merits of the underlying action, and that a balancing of the equities favors the moving party. (Betesh v Jemal, 209 AD2d 568.) By irreparable injury is generally meant harm which is immediate, specific, nonspeculative and nonconclusory. (Grumet v Cuomo, 162 Misc 2d 913.) The burden to be carried in obtaining injunctive relief is heavy when, as here, the relief sought is the same as the ultimate relief sought in the action. (Grumet v Cuomo, supra.)
Plaintiffs admit that they have a sufficient number of gravesites to satisfy needs until well into 1998. Moreover, the papers read on this application make it clear that there are other presently existing cemeteries in Nassau and Suffolk Counties, including one owned by the Diocese located in Brook-haven Town, which can accommodate Catholics. Plaintiffs acknowledge that there is no religious requirement that members of the Catholic faith be buried in a Catholic cemetery. Thus, the Diocese’s claims of an emergency and irreparable harm absent this motion being granted are not substantiated by the facts.
Neither is it disputed that there are other properties available in areas in Nassau County which are already zoned for cemetery use. That such properties might require the expenditure of more money to make cemeteries out of them than the *317 property here cannot either make the Diocese’s cemetery status an emergency situation or render the financial harm irreparable.
The Diocese knew as early as February 1993 that a cemetery was not a permitted use of land in the Village.[3] Moreover, counsel for plaintiffs himself states that it has become almost a matter of accepted practice that the zoning process before the various boards in Nassau County proceed in a leisurely manner.[4] The Diocese admittedly accepted the risks involved in obtaining the requisite municipal approval to use the property as a cemetery at the time of purchase by unconditionally taking title from the United States Government.
Despite this, it appears that the Diocese has not moved with great dispatch in attempting to obtain required approvals. Its claim of delay and bias on the part of the Village is not established under the facts reflected in the papers before the court.
Neither does a balancing of the equities favor the Diocese. Putting aside the impact on the Village, the potential for harm to the Diocese by reason of a denial of this interim relief pales by comparison to the potential harm to the Diocese should the motion be granted, then lost after trial or appeal. In the former instance, the potential harm principally involves the inconvenience of having to drive to more distant Catholic gravesites. In the latter instance, the potential harm involves disinterring anyone buried in the subject parcel in reliance on this court’s grant of the injunctive relief requested. Contrast the delays inherent in all litigation with the fact that the Diocese does not anticipate the need to begin selling plots in the subject parcel until some time in 1998 and some version of the latter scenario appears distinctly possible. The equitable considerations perceived by this court favor erring on the side of denying the application as denial best protects the Diocese’s own interests.
Finally, plaintiffs have not demonstrated the requisite likelihood of success on the merits of their claim. The papers reflect a significant dispute between the parties as to whether a cemetery is a commercial or religious use of the property. Although it will not in and of itself be dispositive, the determination of this issue will greatly impact on the strength of the Diocese’s claim.
*318 Judging by the fact that Catholics are not required to be buried in a Catholic cemetery, it is difficult to see how a cemetery could be a religious use. Comparing the usual time spent at the gravesite part of a funeral and the absence of the requirement that Catholics be interred in a Catholic cemetery, it would appear that the sale of burial plots, not religion, is the more significant aspect of the land usage. It was so held by the Supreme Court of Pennsylvania. "If a business corporation had purchased the eighty-eight acres in question for use as a cemetery and as a business venture for profit, there would be no question but that it was not a religious use within the terms of the Rochester Township ordinance. However, appellant contends that a different result obtains because the owner of the land is not a business corporation but a religious group and, therefore, the use to be made of the land is considered a religious use. The appellant supports this position by arguing that the place of burial and burial rites are important elements within the dogma of its religion. We feel that this argument goes too far; for, if accepted, it would mean that a slaughter house owned by a business would not be permitted in the Sunflower District, whereas, the same slaughter house, if owned by a religious sect having as part of its dogma the requirement that animals be slaughtered in a certain way by a certain person and in accor[d] with certain rites, would be permitted. Appellant’s contention goes not to the actual use to be made of the land but to an extraneous aspect taken on by the land depending on the nature of the land’s owner. We do not find that such a distinction is justified within the intendment of the ordinance. We believe that a cemetery is basically a secular use of land and a use which is not incidental to or in support of the primary uses permitted in the Sunflower District, namely, residential and agricultural. We do not believe that the fact that the land will be owned by a religious institution alters the basic secular use to be made thereof, and we would be most reluctant to construe the ordinance so as to make a distinction not found therein based upon the nature of the owner of the land rather than the nature of the use to be made of the land. Any secular use under appellant’s contention can be capable of a religious characterization if a particular sect ascribed religious implications thereto.” (Appeal of Russian Orthodox Church of Holy Ghost, 397 Pa 126, 128-129, 152 A2d 489, 491 [1959].)
In Matter of Yeshiva & Mesivta Toras Chaim v Rose (136 AD2d 710, 711) the Appellate Division, Second Department, *319 wrote, inter alia: "While recognizing that the courts of this State have been very flexible in their interpretation of religious uses under local zoning ordinances * * * the flexibility has been directed to ancillary or accessory functions of religious institutions whose principal use is a place of worship. Affiliation with or supervision by religious organizations does not, per se, transform institutions into religious ones. 'It is the proposed use of the land, not the religious nature of the organization, which must control’ (Bright Horizon House v Zoning Bd. of Appeals, 121 Misc 2d 703, 709).” (Citations omitted.)
With all respect and without demeaning the significant religious component inherent in a Catholic burial, the actual proposed usage of this property is more commercial than religious.
Insofar as set forth in the papers submitted, the court does not find that the Village has practiced exclusionary zoning here. (See, Matter of Gernatt Asphalt Prods, v Town of Sardinia, 87 NY2d 668.)
Bearing in mind the well-settled rule that because zoning is a legislative act, zoning ordinances and amendments enjoy a strong presumption of legality, and that the burden rests on the party attacking them to overcome that presumption beyond a reasonable doubt, and after carefully examining the Diocese’s contentions, the court does not find that the Diocese has established a likelihood of success on the merits of its claim. (Matter of Cannon v Murphy, 196 AD2d 498, 500.)
It is undisputed that at the public hearing held by the Village, the Diocese did not offer evidence tending to show that the Village’s zoning code and/or comprehensive plan should be changed to permit the establishment of a cemetery. The Diocese’s papers reflect concern that the hearing was held on the issue of whether a cemetery would be in conformity with the Village’s comprehensive plan, which the Diocese says could have been answered more quickly; however, the hearing had another purpose, to act on the Diocese’s application. Indeed, while the Diocese refers to the hearing as being limited to only one issue, there were two distinct issues involved, as set forth in the notice of hearing: "The purpose of the hearing is to consider the threshold questions: (a) whether the use requested in the application is in accordance with the comprehensive plan of the Village; and (b) if it is not in accordance with the *320 existing comprehensive plan, whether the plan should be changed to include the use.”[5]
Moreover, "[mjandamus relief is appropriate only where the right to relief is clear, and the duty sought to be compelled is the performance of an act which is required by law and involves no exercise of discretion”. (Matter of Citywide Factors v New York City School Constr. Auth., 228 AD2d 499, 500.) Here, discretion is a part of the Village’s responsibility, and, therefore, mandamus relief would be inappropriate.
In view of the foregoing, the plaintiffs’ motion is denied.

. Village exhibits 2 and 3.

. Village exhibit 32.

. See, Woodbury affidavit, June 13, 1996, para 7.

. See, Schure affidavit, June 13, 1996, para 8.

. Village exhibit 27.